IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ANDREW GONZALES,               §
TDCJ-CID No. 1289340,          §
                               §
              Plaintiff,       §
                               §
v.                             §         CIVIL ACTION NO. H-08-1492
                               §
WANDA J. ISBELL, et al.,        §
                               §
              Defendants.      §


**<u>MEMORANDUM OPINION AND ORDER</u>**


Andrew Gonzales, an inmate of the Texas Department of Criminal
Justice - Correctional Institutions Division ("TDCJ-CID"), filed
this civil rights action under 42 U.S.C. § 1983 alleging that
several employees of the University of Texas Medical Branch
("UTMB") -- which is contracted by the TDCJ-CID to provided medical
care to inmates -- violated his constitutional rights. Defendants
Wanda J. Isbell, Isabel George, Margaret Cross, and Genger Galloway
have filed Defendants' Motion for Summary Judgment and Brief in
Support (Docket Entry No. 25), and defendants Natasha Davis, Tawona
Holmes, and Stacy Campbell have filed Defendants Davis, Holmes, and
Campbell's Motion for Summary Judgment and Brief in Support (Docket
Entry No. 33).[1]  Also pending before the court are Plaintiff's

_____

[1]In response to these summary judgment motions, Gonzales filed
Plaintiff's Counter-Claim to Defendants' Motion for Summary
(continued...)

Objection to Defendant Isbell, George, and Cross's Original Answer (Docket Entry No. 20),[2] Motion for Entry of Default (Docket Entry No. 28), Motion for Order to Compel Disclosure/Discovery (Docket Entry No. 29), and Motion for Leave for Continuance to Conduct Additional Discovery or Extension of Time (Docket Entry No. 30).

For the reasons explained below, defendants' motions for summary judgment will be granted as to all claims with one exception. The court will deny Defendants' Motion for Summary Judgment (Docket Entry No. 25) as to Gonzales' claim against defendant Isbell in her individual capacity asserting that she violated his Eighth Amendment rights by refusing to grant an appropriate work restriction. The court will deny all of Gonzales' pending motions.

## I.   **Background and Claims**

Gonzales, an inmate in the TDCJ-CID's Ferguson Unit in Midway, Texas, began experiencing back pain and observed blood in his urine on or around September 13, 2007.[3] On September 16, 2007, Gonzales was taken to the medical emergency facility at the TDCJ-CID's Estelle Unit where he was examined by a doctor and diagnosed with

---

[1](...continued)
Judgment (Docket Entry No. 35).

[2]In this filing, Gonzales moves to strike Isbell, George, and Cross' Original Answer (Docket Entry No. 15).

[3]Complaint, Docket Entry No. 1, at 4; Plaintiff's More Definite Statement, Docket Entry No. 8, at 7.

a "renal calculi," more commonly known as a kidney stone, and was given two types of pain medication.[4]

Thereafter, Gonzales periodically experienced severe pain due to the kidney stone until he passed it sometime in late February or early March of 2008.[5]  In November of 2007, he also developed an infection in his right epididymis,[6] which caused additional pain.[7]

Throughout this period, Gonzales was seen and examined by various UTMB healthcare personnel on over twenty occasions.[8]  He was taken to the UTMB hospital in Galveston, Texas, four times to see urological specialists and/or to undergo testing not available

---

[4]Defendants' Motion for Summary Judgment, Docket Entry No. 25, at Exhibit C ("Medical Records"), at MSJ_47-MSJ_49; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 8.

[5]See Complaint, Docket Entry No. 1, at Supp. 1-4; Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-3 - NSC-26; Affidavit of Mary L. Gotcher, RN (March 13, 2009) (stating that Gonzales reported at his March 5, 2008, appointment at the UTMB facility in Galveston that he had passed the stone the week before and that a cytoscopy performed on Gonzales during that visit to Galveston indicated no abnormalities).

[6]The epididymis is "an elongated cordlike structure along the posterior border of the testis; its coiled duct provides for storage, transit, and maturation of spermatozoa and is continuous with the ductus deferens." Dorland's Pocket Medical Dictionary 291 (25th ed. 1995).

[7]See Defendants' Motion for Summary Judgment, Docket Entry No. 25, at Exhibit C ("Medical Records"), at MSJ_68; Complaint, Docket Entry No. 1, at Supp. 3 (describing pain in right testicle).

[8]Medical Records.

at his prison unit.[9]  Gonzales was regularly prescribed or given ibuprofen, naproxen, or acetaminophen to reduce his pain.[10] Occasionally, he was also prescribed or given a small supply of a more potent pain killer such as Darvocet or Tylenol #3.[11]  He was prescribed an antibiotic for his epididymis infection.[12] Additionally, he was excused from his prison work responsibilities for five days beginning on September 20, 2007, and for thirty days beginning on October 8, 2007.[13]

On November 20, 2007, defendant Isbell ordered that Gonzales again be exempted from his normal work responsibilities for thirty days.[14]  Isbell, however, revoked the exemption later the same day

---

[9]Medical Records at MSJ_1, MSJ_57-MSJ_62.

[10]Medical Records at MSJ_18-MSJ_23, MSJ_41-42, MSJ_47. Ibuprofen is a nonsteroidal anti-inflammatory, nonopiod analgesic (pain reliever), and an antipyretic (fever reducer), and Mosby's Nursing Drug Reference 546 (21st ed. 2008).  Naproxen is also a nonsteroidal anti-inflamatory, nonopiod analgesic, and an antipyretic.  Id. at 720.  Acetaminophen is a nonopiod analgesic and an antipyretic.  Id. at 76.

[11]Medical Records at MSJ_22-MSJ_23, MSJ_24-MSJ_26, MSJ_47. Darvocet, or Darvocet-N100, is a combination drug containing acetaminophen and propoxyphene.  Mosby's Nursing Drug Reference 1138 (21st ed. 2008).  Propoxyphene is an opiate analgesic; extended use may result in physical dependency.  Id. at 862-63. Tylenol #3 is a combination drug containing acetaminophen and codeine.  Id. at 1161.  Codeine is an opiate analgesic; extended use may result in physical dependency.  Id. at 299-300.

[12]Specifically, Gonzales was prescribed doxycycline.  Medical Records at MSJ_18, MSJ_68.

[13]Medical Records at MSJ_36, MSJ_44.  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 22-23.

[14]Medical Records at MSJ_24.  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 24.

-4-

after Gonzales apparently attempted to modify his medication pass.[15]
No further work restrictions were approved for Gonzales after that
date, despite several requests by Gonzales to have his work
exemption reinstated because the manual labor he was required to
engage in exacerbated the pain from his kidney stone.[16]

Gonzales, proceeding pro se, initiated this § 1983 suit
against the defendants -- all of whom were UTMB healthcare
employees assigned to the Ferguson Unit -- alleging that they
violated his Eighth Amendment right to be free from cruel and
unusual punishment.[17]   Specifically, Gonzales complains that
defendants Isbell, George, Cross, Galloway, Davis, Holmes, and
Campbell exhibited deliberate indifference to his serious medical
needs when, on several occasions, he was not seen by medical
personnel or provided with medical care after he submitted written
requests for medical attention, walked into the Ferguson Unit
medical facility, or when security personnel made requests for

_____

[15]Complaint, Docket Entry No. 1, at Supp. 3; Memorandum and
Support, Docket Entry No. 2, at 4; Plaintiff's More Definite
Statement, Docket Entry No. 8, at 12, 16; Medical Records at MSJ_14
(indicating that Gonzales altered his medication pass).

[16]See Medical Records at MSJ_69 (medical record entry from
December 6, 2007, by Isbell that there was "[n]o medical indication
for restrictions at this time"); Plaintiff's Counter-Claim to
Defendant's Motion for Summary Judgment, Docket Entry No. 35, at
Exhibit D, at NSC-24 (requesting, on December 7, 2007, a medical
work restriction).   See also Plaintiff's More Definite Statement,
Docket Entry No. 8, at 3.

[17]See Complaint, Docket Entry No. 1; Memorandum and Support,
Docket Entry No. 2; Plaintiff's More Definite Statement, Docket
Entry No. 8.

medical attention on his behalf.[18]   Further, he contends that defendant Isbell deliberately ignored his repeated complaints that the pain medication that was prescribed or given to him, particularly ibuprofen, was ineffective in alleviating his pain and/or caused him more pain.[19]   Gonzales also alleges that Isbell needlessly and deliberately forced him to endure excruciating pain by refusing to excuse him from his prison work responsibilities, which included manual labor.[20]

For his physical pain and mental anguish, he seeks $180,000 in damages.[21]   He also seeks $275,000 in punitive damages.[22]   The defendants have filed motions for summary judgment.[23]

_____

[18]See Complaint, Docket Entry No. 1, at 4, Supp. 1-4; Memorandum and Support, Docket Entry No. 2, at 1-11; Plaintiff's More Definite Statement, Docket Entry No. 8, at 4-7, 8-16, 18-25.

[19]See Complaint, Docket Entry No. 1, at Supp. 1-4; Memorandum and Support, Docket Entry No. 2, at 2-5, 8, 10; Plaintiff's More Definite Statement, Docket Entry No. 8, at 2-4, 7, 10, 12-13, 15-25.

[20]See Complaint, Docket Entry No. 1, at Supp. 1-3; Memorandum and Support, Docket Entry No. 2, at 1-5, 8-11; Plaintiff's More Definite Statement, Docket Entry No. 8, at 1-4, 10, 13-14, 21-25.

[21]Complaint, Docket Entry No. 1, at 4.

[22]Id.

[23]Defendants' Motion for Summary Judgment and Brief in Support, Docket Entry No. 25; Defendants Davis, Holmes, and Campbell's Motion for Summary Judgment and Brief in Support, Docket Entry No. 33.

## II.  <u>Defendants' Summary Judgment Motions</u>

### A.  <u>Summary Judgment Standard</u>

The court may grant summary judgment if the movant establishes that there is no genuine dispute about any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  An examination of substantive law determines which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 106 S. Ct. 2505, 2510 (1986).  Material facts are those facts that "might affect the outcome of the suit under the governing law."  <u>Id.</u>  A genuine issue of material fact exists if the evidence is such that a reasonable trier of fact could resolve the dispute in the nonmoving party's favor.  <u>Id.</u> at 2511.

The party or parties moving for summary judgment have the initial burden to inform the court of the basis for summary judgment.  <u>Celotex Corp. v. Catrett</u>, 106 S. Ct. 2548, 2553 (1986). When the movants do not bear the burden of proof at trial, they may satisfy their initial burden in two ways.  First, they may present evidence negating one or more elements of the nonmoving party's claim.  <u>See</u> <u>id.</u>  Alternatively, they may simply point out the absence of evidence to support the nonmoving party's claim.  <u>Id.</u> at 2254.

If the movants make the required initial showing, the burden shifts to the nonmoving party to show by affidavits, depositions, answers to interrogatories, admissions, or other evidence that

summary judgment is not warranted because genuine fact issues exist.  <u>See</u>  <u>id.</u>  Conclusory allegations, unsubstantiated assertions, or a mere scintilla of evidence will not satisfy the nonmovant's burden.  <u>Little v. Liquid Air Corp.</u>, 37 F.3d 1069, 1075 (5th Cir. 1994).  If the nonmovant fails to present specific evidence showing there is a genuine issue for trial, summary judgment is appropriate.  <u>Topalian v. Ehrman</u>, 954 F.2d 1125, 1132 (5th Cir. 1992).  In reviewing the evidence "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence."  <u>Reeves v. Sanderson Plumbing Prods. Inc.</u>, 120 S. Ct. 2097, 2110 (2000).

## B.   Official Capacity Claims

The defendants contend that they are entitled to summary judgment on Gonzales' claims against them in their official capacities because a state official sued in his official capacity is not a "person" as that term is used in 42 U.S.C. § 1983.[24]  The defendants also contend that Gonzales' claims against them in their official capacities are barred by the Eleventh Amendment.[25]

---

[24]Defendants' Motion for Summary Judgment and Brief in Support, Docket Entry No. 25, at 3; Defendants Davis, Holmes, and Campbell's Motion for Summary Judgment and Brief in Support, Docket Entry No. 33, at 3.

[25]<u>Id.</u>  Gonzales does not contest or otherwise address these arguments in his brief in response to defendants' summary judgment motions.  <u>See</u> Plaintiff's Counter-claim to Defendants' Motion for Summary Judgment, Docket Entry No. 35.

Section 1983 provides, in pertinent part, that

> [e]very <u>person</u> who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added). The Supreme Court has held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." <u>Will v. Michigan Dep't of State Police</u>, 109 S. Ct. 2304, 2312 (1989).

Moreover, the Court has held that "[t]he Eleventh Amendment bars a suit against state officials [in federal court] when 'the state is the real, substantial party in interest.'"[26] <u>Pennhurst State Sch. & Hosp. v. Halderman</u>, 104 S. Ct. 900, 908 (1984) (quoting <u>Ford Motor Co. v. Dep't of Treasury</u>, 65 S. Ct. 347, 350 (1945)). A suit against a state official in his or her official capacity is "no different from a suit against the State itself." <u>Will</u>, 109 S. Ct. at 2312 (citing <u>Kentucky v. Graham</u>, 105 S. Ct. 3099, 3104-05 (1985)).

Because the defendants in this case were state officials when the facts giving rise to this cause of action occurred, Gonzales' claims against them in their official capacities fall outside the

---

[26]The only exception to this rule, not applicable in this case, is that state officials may be sued in their official capacities for prospective injunctive relief to remedy violations of federal law. <u>See</u> <u>Halderman</u>, 104 S. Ct. at 909-912. <u>See also</u> <u>Ex parte Young</u>, 28 S. Ct. 441 (1908).

scope of § 1983 and are barred by the Eleventh Amendment. Therefore, the defendants are entitled to judgment as a matter of law as to Gonzales' claims against them in their official capacities.

## C.   Individual Capacity Claims

The defendants contend that they are protected by qualified immunity as to the claims against them in their individual capacities.   The defendants also assert that Gonzales' claims against them fail because he has not presented sufficient evidence to create a genuine issue of material fact as to whether they acted with the deliberate indifference necessary to violate the Eighth Amendment.   Further, the defendants submitted evidence that they contend definitively demonstrates that Gonzales received adequate medical care.

### 1.   Qualified Immunity Standard

Qualified immunity shields "state official[s] exercising discretionary authority" from personal liability for conduct that violates a plaintiff's federal constitutional or statutory rights "unless at the time and under the circumstances of the challenged conduct all reasonable officials would have realized that it was proscribed by the federal law on which the suit is founded." Dudley v. Angel, 209 F.3d 460, 462 (5th Cir. 2000) (quoting Pierce v. Smith, 117 F.3d 866, 871 (5th Cir. 1997)).   In analyzing a qualified immunity defense, the court must first consider whether "the plaintiff has alleged a violation of a clearly established

constitutional right." <u>Easter v. Powell</u>, 467 F.3d 459, 462 (5th Cir. 2006).  There are three components to this first inquiry: "(1) whether a constitutional violation is alleged; (2) whether the law regarding the alleged violation was clearly established at the time of the alleged violation; and (3) whether the record shows that the violation occurred." <u>Dudley</u>, 209 F.3d at 462.

If the plaintiff can make the first required showing, the court then considers whether "the defendant's conduct was objectively reasonable in light of the clearly established law at the time of the incident." <u>Easter</u>, 467 F.3d at 462.  Only if the state official's conduct was objectively unreasonable is the official not entitled to qualified immunity. <u>See</u> <u>id.</u>

2.  <u>Eighth Amendment Standard</u>

The Eighth Amendment does not guarantee a convicted felon the right to be free from all discomfort. <u>See</u> <u>Rhodes v. Chapman</u>, 101 S. Ct. 2392, 2400 (1981) ("[T]he Constitution does not mandate comfortable prisons, and prisons . . . which house persons convicted of serious crimes, cannot be free from discomfort").  The Eighth Amendment does, however, prohibit treatment that involves "the wanton and unnecessary infliction of pain" upon incarcerated individuals. <u>Id.</u> at 2399.

In the context of the provision of medical care to prisoners, "an inadvertent failure to provide adequate medical care cannot be said to constitute" an Eighth Amendment violation. <u>Estelle v. Gamble</u>, 97 S. Ct. 285, 292 (1976).  Nor is a prisoner treated

unconstitutionally if a health care provider acts negligently or commits medical malpractice in providing medical care.  Id.  A prisoner, in the absence of extraordinary circumstances, has not proved deliberate indifference by showing that he disagreed with his medical care provider as to what treatment was appropriate. Banuelos v. McFarland, 41 F.3d 232, 235 (5th Cir. 1995).  Even unsuccessful medical treatment does not give rise to a cognizable claim.  Varnardo v. Lynaugh, 920 F.2d 320, 321 (5th Cir. 1991) (citing Johnson v. Treen, 759 F.2d 1236, 1238 (5th Cir. 1985)).

Instead, the Eighth Amendment is violated only if a prison official manifests "deliberate indifference to serious medical needs" of a prisoner.  Estelle, 97 S. Ct. at 291.  The official acts with deliberate indifference only if he subjectively "knows of and disregards an excessive risk to inmate health and safety." Farmer v. Brennan, 114 S. Ct. 1970, 1979 (1994).  In other words, "the plaintiff must show that the officials 'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would evince a wanton disregard for any serious medical needs.'"  Domino v. Tex. Dep't of Criminal Justice, 239 F.3d 752, 756 (5th Cir. 2001) (quoting Treen, 759 F.2d at 1238)).  Where the prisoner's medical records document assessment and treatment of the plaintiff's medical complaints, he has not been subjected to unconstitutional treatment.  See McCord v. Maggio, 910 F.2d 1248, 1251 (5th Cir. 1990).  See also Banuelos, 41 F.3d at 235 ("Medical records of sick calls, examinations,

-12-

diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.").

Inmate working conditions "must be evaluated in the light of the particular medical conditions of the complaining prisoner." Jackson v. Cain, 864 F.2d 1235, 1246 (5th Cir. 1989). Forcing a prisoner to work, alone, is not unconstitutional. Moody v. Baker, 857 F.2d 256, 258 (5th Cir. 1988) (per curiam). But,

> 'when the type of work to which the convict is assigned admittedly worsens a pathological condition, such work must be deemed cruel and unusual punishment within the meaning of the Eighth Amendment to the United States Constitution, when the work has been assigned with the knowledge of the condition and that it will be worsened thereby or when it has been continued with the same knowledge.' At least this is so where the pathological condition is a medically serious one, and the worsening is significant.

Jackson, 864 F.2d at 1246 (quoting Black v. Ciccone, 324 F. Supp. 129, 133 (W.D. Mo. 1970)). See also Mendoza v. Lynaugh, 989 F.2d 191, 194 (5th Cir. 1993) ("To be sure, if prison officials assign an inmate to work detail and they know that such an assignment could exacerbate a serious physical ailment, then such a decision could constitute deliberate indifference."). Importantly, the pathological condition or physical ailment need not result in permanent injury in order to be considered "serious." See Jackson, 864 F.2d at 1247 ("We have never imposed a permanent injury requirement on claims under the Eighth Amendment.") (citing Bienvenu v. Beauregard Parish Police Jury, 705 F.2d 1457 (5th Cir. 1983)). All of these legal principles were clearly

-13-

established in late-2007 and early-2008 when the challenged conduct occurred.

    3.  <u>Evidence</u>

In support of their motions for summary judgment, the defendants have submitted portions of Gonzales' medical records.[27] They have also submitted the affidavit of Betty J. Williams, MD, the Medical Director at the TDCJ-CID's Eastham and Ellis Units,[28] and the affidavit of Mary L. Gotcher, a Registered Nurse ("RN") and the Nursing Director for the Northern Division of UTMB's Correctional Managed Care.[29]

Gonzales has submitted copies of twenty six written requests for medical attention that he submitted during the period that he suffered from the kidney stone.[30]   He has also submitted the

---

    [27]Gonzales' medical records are included in Defendants' Motion for Summary Judgment, Docket Entry No. 25, at Exhibit C.

    [28]Doctor Williams' affidavit is included in Defendants' Motion for Summary Judgment, Docket Entry No. 25, at Exhibit A.

    [29]Nurse Gotchers' affidavit is included in Defendants' Motion for Summary Judgment, Docket Entry No. 25, at Exhibit B.

    [30]<u>See</u> Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D.

affidavits of several fellow inmates[31] and copies of grievance forms
that he filed with TDCJ-CID.[32]

The evidence in the record indicates that Gonzales first
requested medical care for the symptoms related to his kidney stone
on September 14, 2007.[33] Gonzales reported that he had been
urinating blood and asked to see a doctor.[34] Gonzales was issued
a pass to see a nurse at the prison medical facility on the morning
of September 16, 2007, but for reasons that are disputed, he did

---

[31]See Declaration of Joe A. Bernal (Dec. 30, 2007) (included
as an attachment to Memorandum and Support, Docket Entry No. 2);
Declaration of Llewelllyn Hawkins (April 16, 2008) (included as an
attachment to Memorandum and Support, Docket Entry No. 2);
Affidavit of Richard Soto (Aug. 14, 2008) (included in Plaintiff's
Counter-Claim to Defendants' Motion for Summary Judgment, Docket
Entry No. 35, at Exhibit E); Affidavit of Jose Gonzales (included
in Plaintiff's Counter-Claim to Defendants' Motion for Summary
Judgment, Docket Entry No. 35, at Exhibit F). Mr. Bernal and
Mr. Hawkins state that they observed Gonzales in severe pain on
various occasions. Mr. Soto asserts that he (Soto) injured his
foot, but that NP Isbell refused to grant him a work restriction,
causing him severe pain. Mr. Jose Gonzales states that he observed
Gonzales in pain on several occasions, but that Gonzales did not
immediately receive medical treatment to relieve his pain.

[32]Gonzales included the Greivance Forms as attachments to his
Complaint, Docket Entry No. 1.

[33]Gonzales' first request for medical care was stamped as
received on September 15, but his second request stated that the
first request was submitted on September 14. See Plaintiff's
Counter-Claim to Defendant's Motion for Summary Judgment, Docket
Entry No. 35, at Exhibit D, at NSC-1 - NSC-2. For all of Gonzales'
written medical requests, the court assumes that Gonzales submitted
the request on the date that it was stamped as received unless an
earlier date is noted by Gonzales elsewhere.

[34]Id. at NSC-1.

not see a nurse or any other medical personnel that morning.[35]
Later that evening, Gonzales reported to security personnel that he
was in severe pain, so he was transported to the emergency medical
facility at the TDCJ-CID's Estelle Unit.[36]  At the Estelle Unit, he
was diagnosed with a "renal calculi," more commonly known as a
kidney stone.[37]  He was given the pain medications ibuprofen and
Darvocet and told to follow up with medical personnel at the
Ferguson Unit.[38]

The next day, September 17, 2007, Gonzales met with Nurse
Practitioner ("NP")[39] Wanda Isbell -- one of the defendants in this
action -- at the Ferguson Unit.[40]  She examined Gonzales, ordered

---

[35]Gonzales alleges that he reported to the prison clinic on
September 16, 2007, but that the nurse who had issued the pass had
already left for the day, and the other nurses refused to see him.
Complaint, Docket Entry No. 1, at 4.  See also Plaintiff's Counter-
Claim to Defendant's Motion for Summary Judgment, Docket Entry
No. 35, at Exhibit D, at NSC-2.  The defendants have introduced
evidence stating that Gonzales simply failed to report to the
clinic on the morning of September 16.  Affidavit of Betty
J. Williams, M.D. (March 16, 2009) (included in Defendants' Motion
for Summary Judgment, Docket Entry No. 25, at Exhibit A).

[36]Affidavit of Betty J. Williams, M.D. (March 16, 2009);
Affidavit of Mary L. Gotcher, RN (March 13, 2009) (included in
Defendants' Motion for Summary Judgment, Docket Entry No. 25, at
Exhibit B).

[37]Medical Records at MSJ_47-MSJ_49; Affidavit of Betty
J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher,
RN (March 13, 2009).  See also Plaintiff's More Definite Statement,
Docket Entry No. 8, at 8.

[38]Medical Records at MSJ_47-MSJ_49.

[39]An NP is an "advanced nursing role." Affidavit of Mary
L. Gotcher, RN (March 13, 2009).  An NP may "make medical decisions
and write medical orders."  Id.

[40]Medical Records at MSJ_65; Affidavit of Betty J. Williams,
(continued...)

-16-

an x-ray and a urinalysis,[41] and instructed Gonzales on taking the pain killers provided to him at the Estelle Unit emergency facility.[42]   She declined, however, to exempt Gonzales from his prison work assignments at that time.[43]

On September 18 and 19, 2007, Gonzales submitted written requests for medical care.[44]   In these requests, Gonzales communicated that he was still in pain and requested that he be excused from his work responsibilities.  Both written requests were returned with notations indicating that Gonzales had already been seen regarding these symptoms on September 17, 2007.

On September 20, 2007, Gonzales came to the prison medical facility complaining of intense pain.[45]   He was seen by NP Isbell and Genger Galloway, a Licensed Vocational Nurse ("LVN").  Gonzales

---

[40](...continued)
M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).

[41]The x-ray was inconclusive as to the presence of a kidney stone due to the presence of intestinal gas and fecal material. Medical Records at MSJ_3.  The urinalysis indicated the presence of blood in Gonzales' urine.  Id. at MSJ_65.

[42]See Medical Records at MSJ_65; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).

[43]Id.  See also Complaint, Docket Entry No. 1, at Supp. 1.

[44]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-3 - NSC-4.

[45]Medical Records at MSJ_44-MSJ_46; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 22.

-17-

was observed to be in obvious pain.  He was prescribed a ten-day supply of ibuprofen and a three-day supply of Tylenol #3. Moreover, he was medically unassigned from work for 5 days.

On September 22, 2007, Gonzales submitted a written request for medical attention.[46]  He complained that he was still in pain and that he had not received any treatment other than pain medication.  The responding nurse indicated that Gonzales had a follow-up appointment scheduled "very soon."

Gonzales submitted two more requests the following day, September 23, 2007.[47]  In response to the first request, the nurse noted that a follow-up appointment was scheduled for the next day, September 24, 2007.  In response to the second request, the nurse indicated that Gonzales had been seen regarding this complaint on September 20, 2007, and had been prescribed medication.

At the follow-up appointment on September 24, 2007, Gonzales was seen by NP Isbell and LVN Natasha Davis.[48]  A urinalysis was conducted and revealed blood in Gonzales' urine.  Gonzales reported that he was still experiencing pain in his right side.  Gonzales

_____

[46]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-5.

[47]See id. at NSC-6 - NSC-7.

[48]Medical Records at MSJ_17; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 22.

was advised to continue taking his prescribed pain medication, but his work exemption was not extended.

Gonzales filed two written requests for medical attention on September 26, 2007.[49]  He complained that he was in pain, that he had not yet been definitively diagnosed with a kidney stone, that his prescribed pain relievers were not effective, and that he should be relieved of his work duties.  The response to the first request stated that the responding nurse had spoken with Isbell about Gonzales' case and that they were awaiting test results.  The second response stated that Gonzales had already been seen regarding this problem on September 24, 2007.

On September 28, 2007, Gonzales walked into the prison medical facility and was seen by LVN Margaret Cross.[50]  Cross examined Gonzales, who complained of pain on his right side.  A urinalysis was performed, but was negative for blood.  Cross notified NP Isbell, who ordered that Gonzales discontinue taking ibuprofen and be given Tylenol instead.[51]  His work responsibilities were not changed.

---

[49] See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-7 – NSC-8.

[50] See Medical Records at MSJ_41-42; Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 22.

[51] Tylenol is a name-brand for acetaminophen.  See Mosby's Nursing Drug Reference 76 (21st ed. 2008).

-19-

On October 3, 2007, Gonzales came to the prison medical facility as a walk-in at 3:15 am complaining of severe pain.[52]  He was examined by LVN Tawona Holmes.  Holmes contacted NP Isbell, who directed Holmes to give Gonzales ibuprofen immediately and instruct him to follow up with Isbell later that day.

Gonzales followed up with Isbell later in the day on October 3, 2007.[53]  Isbell prescribed ibuprofen for ten days, Tylenol #3 for three days, and Bactrim, an antibiotic,[54] for ten days.  She ordered an x-ray, which was performed that day and revealed the presence of a probable kidney stone approximately 4 mm in diameter.[55]  Isbell also referred Gonzales to a urologist.

On October 5, 2007, Gonzales submitted two written requests for medical attention.  In the first he requested that he be referred to a specialist and stated that the ibuprofen that he had been prescribed was not effective in relieving his pain.[56]  The

---

[52]See Medical Records at MSJ_38-40; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 23.

[53]See Medical Records at MSJ_34; Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 23.

[54]Bactrim is a brand-name for the antibiotic trimethoprim-sulfamethoxazole.  See Mosby's Nursing Drug Reference 1036 (21st ed. 2008).

[55]See Medical Records at MSJ_2.

[56]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-7 - NSC-9.

responding nurse stated that Gonzales had been seen on October 3, 2007, for this problem and had been referred to a urologist.  In the second request, Gonzales stated that his prescriptions were not available at the "pill window."[57]  The responding nurse instructed Gonzales to check at the pill window again that afternoon.

Gonzales again submitted written requests for medical attention on October 6, 2007, October 7, 2007, and October 8, 2007.[58]  In the October 6 request, he asked to see the "provider" because the ibuprofen prescribed "does not help but seems to make the pain worse when taken as directed."[59]  The responding nurse stated that Gonzales had been prescribed Tylenol #3 through October 7, 2007, and instructed him to continue taking ibuprofen as ordered.  In the October 7 request, Gonzales complained that he was in pain, stated that the ibuprofen he had been prescribed was not available at the pill window, and stated that the ibuprofen made his pain worse.[60]  The response to this request consisted only of the notation "PSC."  In Gonzales' October 8 request, he stated that

_____

[57]See id. at NSC-10.

[58]Gonzales dated most of his medical requests beginning with the October 6, 2007, request.  For those requests that Gonzales dated, the court assumes that they were submitted on the date that Gonzales has noted instead of the date on which they are stamped as received.  The October 6 request was stamped as received on October 7.  The October 7 request was stamped as received on October 8.  The October 8 was request was not dated by Gonzales, but was only stamped as received on October 8.

[59]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-11.

[60]See id. at NSC-12.

he needed to see a doctor, not a "nurse provider."[61]  He complained that he had been suffering from the same problem for sixteen days, that his pain was severe, that he felt like he was dying, and that the pain did not go away.  Again, the response read "PSC."

Gonzales came to the prison medical facility on October 8, 2007, complaining of severe pain and was seen by LVN Galloway and NP Isbell.[62]  After examining Gonzales, Isbell ordered that Gonzales discontinue taking the ibuprofen, prescribed naproxen instead, and ordered that he be exempted from his usual work responsibilities for thirty days.

On October 11, 2007, Gonzales submitted a written request for medical care.[63]  He stated that he needed to see a doctor because the medication that he had been provided was not effective and he was still in pain.  The response consisted of the notation "NSC."

Gonzales submitted another written request on October 13, 2007.[64]  In this request, Gonzales again stated that he needed to see a doctor because his medication was not effective.  He stated

_____

[61]See id. at NSC-13.

[62]See Medical Records at MSJ_36-MSJ_37; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 23.

[63]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-14. This request was stamped as received on October 15, 2007.

[64]See id. at NSC-15.  This request was stamped as received on October 15, 2007.

-22-

that he thought the medication made his pain worse, and that he was nauseous.  The response stated, "Discuss at today's NSC appt."

Gonzales was seen by NP Isbell and LVN Davis on October 16, 2007.[65]  Gonzales complained of pain, stated that the naproxen was not effective, and requested a stronger pain killer.  He was examined, and a urinalysis was conducted, which was negative for the presence of blood.  Gonzales, however, refused to allow the nurses to conduct a rectal exam.  Isbell instructed Gonzales to continue taking the naproxen.

On October 21, 2007, Gonzales submitted a written request for medical attention asking whether he was scheduled to see a urologist soon.[66]  The response stated that Gonzales' urologist appointment had been approved, but not yet scheduled.

Gonzales submitted another written request on October 25, 2007.[67]  In this request, he stated that his right side was still hurting occasionally and that he needed "something for this pain." He also again inquired about when he would see a urologist and asked why it was taking so long.  The responding nurse stated that Gonzales had been given naproxen for his pain and that his urologist appointment, although approved, had not been scheduled.

---

[65]See Medical Records at MSJ_16.  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 23.

[66]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-16. This request was stamped as received on October 22, 2007.

[67]See id. at NSC-17.  This request was stamped as received on October 26, 2007.

On October 29, 2007, Gonzales submitted a written request for medical attention stating that he needed to see a doctor.[68]   He claimed that he was experiencing pain on his right side that made it difficult for him to move.   The response consisted of the notation "PSC."

Gonzales met with NP Isbell on October 31, 2007.[69]   He complained that he was still having pain on his right side.   Isbell prescribed naproxen for another thirty days.   Gonzales alleges that Isbell told him at this appointment that naproxen "was the strongest pain reliever on the market [and] if that could not relieve the pain then there was nothing else they could do for me."[70]

On November 6, 2007, and November 8, 2007, Gonzales submitted written medical requests.[71]   In both requests, Gonzales requested to see a doctor.   He complained that he was in pain, that he had been to the medical facility several times, but that the nurses

---

[68]See id. at NSC-18.  This request was stamped as received on October 30, 2007.

[69]See Medical Records at MSJ_70; Affidavit of Betty J. Williams, M.D. (March 16, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 23.

[70]Plaintiff's More Definite Statement, Docket Entry No. 8, at 23.

[71]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-19 - NSC-20.  The first request was stamped as received on November 7, 2007.  The second request was stamped as received on November 9, 2007.

there had refused to see him and instructed him to "put in a sick-call." He stated that his pain medication was not effective when his pain was at its worst. The response to the first request stated that Gonzales' pain medication had been re-ordered, that he had been approved for a referral to urology, and advised him to check at the pill window. The response to the second request stated "NSC."

On November 10, 2007, Gonzales was seen by LVN Davis.[72] Gonzales complained that he was continuing to have pain in his right side, although he was not in pain at the moment, and requested "something for the pain." A urinalysis was conducted, which was negative for the presence of blood. Davis instructed Gonzales to continue taking the prescribed naproxen.

Gonzales was transported to the UTMB facility in Galveston on November 14, 2007, where he was seen by a urologist.[73] Testing confirmed the presence of a 5 mm kidney stone. The doctor ordered that Gonzales be scheduled for an intravenous pyelogram ("IVP").[74]

_____

[72]See Medical Records at MSJ_15. See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 23.

[73]See Medical Records at MSJ_61-MSJ_62; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009). See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 24.

[74]Pyelography is "radiography of the renal pelvis and ureter after injection of contrast material." Dorland's Pocket Medical Dictionary 679 (25th ed. 1995).

On November 20, 2007, security personnel brought Gonzales to the prison medical facility, where he was examined by LVN Cross.[75] Gonzales complained of severe pain, and a urinalysis indicated the presence of trace amounts of blood.  Cross contacted NP Isbell, who prescribed a three-day supply of Darvocet and a thirty-day supply of ibuprofen, and ordered that Gonzales be exempted from his usual work responsibilities for thirty days.  However, as the court will discuss in greater detail below, Isbell revoked this work exemption later that day after Gonzales apparently attempted to modify his medication pass.[76]

Gonzales submitted a written request for medical attention on November 25, 2007.[77]  He asked to see "the provider," and explained that he had started experiencing pain in his groin area and that the ibuprofen caused him to have stomach pain.   The responding nurse replied with the notation "NSC."

On November 28, 2007, Gonzales was seen by LVN Davis.[78]  He reported that he had been experiencing pain in his right kidney area and groin area.  Davis contacted NP Isbell, who ordered that

---

[75]See Medical Records at MSJ_24-MSJ_26; Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 24.

[76]See Medical Records at MSJ_14.  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 16.

[77]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-21.

[78]See Medical Records at MSJ_13.  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 24.

Gonzales be advised to continue taking the prescribed ibuprofen for pain.

Also on November 28, 2007, Gonzales submitted a written request for medical attention.[79]  Gonzales asked what medication had been given to him.  He stated that the pills he had been provided did not say ibuprofen on them as they usually did.   He also inquired as to whether Davis had spoken with Isbell about switching him to a pain killer other than ibuprofen "since it does not help and makes the existing problem worse."   The responding nurse stated, "The provider wanted you to continue taking ibuprofen."

Gonzales submitted another written request for medical attention on December 3, 2007.[80]  In this request, Gonzales asked to see "the doctor or P.A. immediately."  He stated that he must have injured himself while carrying his possessions during a "shake down" that had occurred that day.  He complained that he was unable to move without experiencing severe pain and that his pain medication did not help.  The responding nurse replied with the notation "NSC."

Gonzales was seen by LVN Davis on December 5, 2007.[81] Gonzales complained of pain, including pain in his groin, and stated that

_____

[79]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-22. This request was stamped as received on December 3, 2007.

[80]Id. at NSC-23.   This request was stamped as received on December 4, 2007.

[81]See Medical Records at MSJ_12.

his pain medication was not effective.  Davis scheduled Gonzales to "see provider for pain medication adjustment."

Gonzales saw NP Isbell the next day, December 6, 2007.[82] Gonzales complained of increased pain, including pain radiating to his scrotum, and that the ibuprofen was ineffective.  Isbell gave Gonzales ten packages of Tylenol to taken "in between doses of ibuprofen" and advised him to watch his urine for passage of the kidney stone.  Isbell concluded that a work restriction was not medically indicated at that time.

On December 7, 2007, Gonzales submitted a written request for medical care.[83]  He asked to see a doctor "because I need some type of work restriction . . . ."  He complained that every time he worked in the field, he had to be "brought back for an emergency walk-in" due to severe pain in his side and groin.  The response consisted of the notation "NSC."

Gonzales saw LVN Cross on December 8, 2007.[84]  Gonzales complained of pain on his right side, but admitted that the pain

---

[82]See Medical Records at MSJ_69; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 24.

[83]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-24. This request was stamped as received on December 7, 2007.

[84]See Medical Records at MSJ_11; Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 24.

was not as severe as it had been.  Cross instructed Gonzales to continue taking the prescribed pain medication.

Gonzales submitted a written request for medical attention on December 17, 2007.[85]  In this request, Gonzales asked to see a doctor and complained of pain in his right side and groin.  He again stated that the ibuprofen was ineffective.  The response stated that Gonzales had been seen regarding this problem on December 6 and December 8, 2007.

On December 21, 2007, Gonzales submitted another written medical request.[86]  He asked to see a doctor, expressed his frustration at his continuing pain, complained that the ibuprofen was ineffective, and stated that his pain was "excruciating."  The responding nurse replied with the notation "NSC."

LVN Cross came to Gonzales' cell on December 22, 2007.[87] Gonzales reported pain on his right side, but no difficulty urinating and no blood in his urine.  Cross called Isbell from the cell block, and Isbell told Cross to instruct Gonzales to increase his water intake.

---

[85]See Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-25. This request was stamped as received on December 17, 2007.

[86]Id. at NSC-26.  This request was stamped as received on December 22, 2007.

[87]See Medical Records at MSJ_9.  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 24-25.

Gonzales was seen by LVN Sandra Hunt, who is not a defendant in this case, on December 23, 2007.[88]  Gonzales demanded to see a "real doctor," not a "provider" or a "nurse."  He complained of pain in his right side, down to his scrotum.  Hunt advised him to rest, drink fluids, and take Tylenol.

On December 28, 2007, Gonzales was examined by Physician's Assistant ("PA") Charles Nagel, who is not a defendant in this case.[89]  Nagel diagnosed Gonzales with an infection of his right epididymis, a structure on the posterior portion of the testicle.[90] Nagel prescribed doxycyline, an antibiotic, to treat the infection.

On January 8, 2009, Gonzales traveled to the UTMB facility in Galveston and underwent the IVP that the urologist had ordered on November 14, 2007.[91]  The IVP did not reveal the presence of a kidney stone nor did it reveal any evidence of any other abnormality.

Gonzales was seen by LVN Patricia Kendrick and PA Kimberly Forsti, neither of whom are defendants in this case, on January 14,

---

[88]See Medical Records at MSJ_8.  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 25.

[89]See Medical Records at MSJ_68; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).  See also Plaintiff's More Definite Statement, Docket Entry No. 8, at 25.

[90]Dorland's Pocket Medical Dictionary 291 (25th ed. 1995).

[91]See Medical Records at MSJ_68; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).

2008.[92]  He complained that he was still experiencing pain in his right testicle and of the frequent urge to urinate.  Forsti told Gonzales that it may take a while for his kidney stone to pass. The court is unable to discern whether Forsti ordered any treatment or medication.

On February 6, 2008, Gonzales again traveled to the UTMB facility in Galveston.[93]  There, he was examined by a urologist, who attempted to perform a cystoscopy.[94]  Because the cystoscopy was unsuccessful, the urologist ordered that Gonzales be rescheduled for another cystoscopy.

On March 5, 2008, Gonzales returned to Galveston, and a cystoscopy was successfully performed.[95]  The cystoscopy did not reveal any abnormalities of the bladder or urethra, and did not indicate the presence of a stone.  Although the medical records provided to the court do not so indicate, the affidavit of RN Gotcher states that Gonzales reported to the urologist that he passed the stone the week before this appointment.  The affidavit

---

[92]See Medical Records at MSJ_5-MSJ_7.

[93]See Medical Records at MSJ_59-MSJ-60; Affidavit of Betty J. Williams, M.D. (March 16, 2009).

[94]A cystoscopy is a "visual examination of the urinary tract with an endoscope." Dorland's Pocket Medical Dictionary 212 (25th ed. 1995).  An endoscope is "an instrument for examining the interior of a hollow viscus." Id. at 285.

[95]See Medical Records at MSJ_57-MSJ_58; Affidavit of Betty J. Williams, M.D. (March 16, 2009); Affidavit of Mary L. Gotcher, RN (March 13, 2009).

of Dr. Williams states that the urologist concluded that Gonzales'
kidney stone was "now resolved."   There is no evidence in the
record, and Gonzales does not allege, that he suffered or continues
to suffer from any pain, negative health effects, or injuries after
the passage of the kidney stone.[96]

      4.   <u>Claims Against Defendants Davis, Holmes, Galloway, Cross,
          Campbell, and George</u>

Gonzales alleges that defendants Davis, Holmes, Galloway,
Cross, Campbell, and George manifested deliberate indifference to
his serious medical needs on several occasions when he was not
promptly seen or provided medical treatment by a nurse or doctor
after he submitted written requests for medical attention, walked
into the prison medical facility, or when security personnel
requested medical attention on Gonzales' behalf.   As the evidence
indicates, in some of these instances, the defendants would respond
to Gonzales' requests with the explanation that Gonzales had
already been seen and/or treated for the symptoms of which he was
complaining.   In other instances, they would simply instruct
Gonzales to continue his current course of treatment, which
generally involved taking pain killers, resting, and drinking

---

[96]When Gonzales was asked what harm was caused by the events
that gave rise to this suit, he stated only that he experienced
physical pain and mental anguish, but not that he suffered any harm
after he passed the kidney stone or that he continues to have any
lingering symptoms.   Plaintiff's More Definite Statement, Docket
Entry No. 8, at 25.   When asked what his current diagnosis was, he
responded that it was "normal."   <u>Id.</u> at 8.

increased amounts of fluids.  On other occasions, Gonzales was not immediately seen, but his written requests were returned with the notation "NSC" or "PSC," which the court gathers is a notation that authorized Gonzales to come into the medical facility for an appointment, usually the following day.  In all instances, however, the defendants responded in some way to Gonzales' requests.

The evidence does not show that these defendants "'refused to treat [Gonzales], ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would evince a wanton disregard for any serious medical needs.'" Domino, 239 F.3d at 756 (quoting Treen, 759 F.2d at 1238)).  Instead, Gonzales' medical records indicate that he was frequently examined by nurses or doctors.  He was seen on several occasions by urology specialists.  Multiple tests were performed, and he was diagnosed with a kidney stone.  Furthermore, he was consistently given medication for his symptoms.  See Banuelos, 41 F.3d at 235 ("Medical records of sick calls, examinations, diagnoses, and medications may rebut an inmate's allegations of deliberate indifference.").  Although there may have occasionally been a delay of a day or more between the time that Gonzales submitted a request for medical care and his next examination, there is no evidence in the record to suggest that Gonzales suffered "substantial harm" due to that delay.  Mendoza, 989 F.2d at 195 ("[D]elay in medical care can only constitute an Eighth Amendment violation if there has been deliberate indifference, which results in substantial harm.").

-33-

Further, just because these defendants would not see Gonzales, allow him to come to the prison clinic, or provide additional treatment every time he requested medical attention does not mean they were deliberately indifferent to his plight.  Based on Gonzales' medical records, these defendants were undoubtedly aware of Gonzales' diagnosis and that he was receiving pain medication for his symptoms.  There was only so much they could do for Gonzales, who as a prisoner was not entitled to "the best [healthcare] that money could buy." Mayweather v. Foti, 958 F.2d 91 (5th Cir. 1992).  He undoubtedly experienced ongoing pain from his kidney stone, but that "does not . . . in and of itself demonstrate that a constitutional violation occurred."   Id. Moreover, to the extent that Gonzales asserts that these defendants -- all of whom were nurses or Medical Assistants[97] -- should have provided him with stronger pain medication or exempted him from his

----

[97]Holmes is either an LVN or an RN.  Gonzales identifies her as a RN, see Complaint, Docket Entry No. 1, at 3, and at least one of the responses to Gonzales' written requests for medical attention is signed "Holmes, RN." See, e.g., Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-16.  The medical record entry from Gonzales' visit to the prison medical facility on October 3, 2007, however, indicates that Holmes is a LVN.  See Medical Records at MSJ_40.  Cross is a LVN.  Affidavit of Mary L. Gotcher, RN (March 13, 2009).  Gonzales identifies George as a LVN, see Complaint, Docket Entry No. 1, at 3, but Nurse Gotcher states that George is a Medical Assistant.  Affidavit of Mary L. Gotcher, RN (March 13, 2009).  Davis and Galloway are LVNs.  See Complaint, Docket Entry No. 1, at 3; see also, e.g., Medical Records at MSJ_12, MSJ_46. Campbell is either a LVN or a Medical Assistant.  Compare Complaint, Docket Entry No. 1, at 6 (identifying Campbell as an LVN) with Memorandum and Support, Docket Entry No. 2, at cover (identifying Campbell as a Medical Assistant).

usual work duties, uncontradicted evidence indicates that such actions were beyond the scope of their practice.[98]

Accordingly, the evidence in the record shows that these defendants did not violate Gonzales' Eighth Amendment rights. He has therefore failed to overcome their qualified immunity defense, and they are entitled to summary judgment on Gonzales' claims against them in their individual capacities.

### 5.   Claims Against Defendant Isbell

Gonzales asserts three claims against Isbell. He first alleges that she, like the other defendants, refused to examine him and/or provide treatment on several occasions when he requested medical care. For the reasons stated above with regard to the other defendants, this claim against Isbell fails. Gonzales' medical records rebut the claim that Isbell was deliberately indifferent by denying care because they demonstrate that Gonzales was examined, diagnosed, treated, and frequently re-examined and re-evaluated. See Banuelos, 41 F.3d at 235.

Gonzales next asserts that Isbell exhibited deliberate indifference to his serious medical needs by refusing to provide

---

[98]See Affidavit of Mary L. Gotcher, RN (March 13, 2009) (stating, with respect to defendants Cross, a LVN, and George, a Medical Assistant, that "[i]t was outside their scope of practice to 'order' pain medication, and medical or activity/work restrictions."). This is further supported by Gonzales' medical records, which reflect that the nurses who saw Gonzales examined him and then contacted NP Isbell for instructions as to whether any new medication, treatment, or work exemption should be provided; otherwise they would merely reiterate Isbell's past orders.

him with effective pain medication.   Gonzales contends that the
pain relievers prescribed by Isbell, particularly ibuprofen, did
not adequately relieve his pain, and that it actually caused him
more pain.   The evidence shows that Isbell initially prescribed
ibuprofen for Gonzales' long-term, daily use.[99]  Gonzales complained
that the ibuprofen was ineffective, so on September 28, 2007,
Isbell ordered that he be given Tylenol.[100]  When Gonzales came to
the clinic on October 3, 2007, again claiming to be in pain, Isbell
reinstated his ibuprofen prescription.[101]  When Gonzales complained
once more about the effectiveness of ibuprofen Isbell gave him a
prescription for naproxen on October 8, 2007.[102]  Gonzales submitted
written complaints stating that the naproxen was not effective on
October 11, 2007,[103] October 13, 2007,[104] and November 8, 2007.[105]  On
November 20, 2007, Isbell switched him back to ibuprofen.[106]  After
Gonzales again complained about the ibuprofen, he was given Tylenol

---

[99]Medical Records at MSJ_44.

[100]Id. at MSJ_41.

[101]Id. at MSJ_34.

[102]Id. at MSJ_36.

[103]Plaintiff's Counter-Claim to Defendant's Motion for Summary
Judgment, Docket Entry No. 35, at Exhibit D, at NSC-14.

[104]Id. at NSC-15.

[105]Id. at NSC-20.

[106]Medical Records at MSJ_24.

on December 6, 2007.[107]   After more complaints about his pain
medication, Gonzales as again prescribed naproxen by PA Nagel on
December 23, 2007.[108]   Additionally, on several occasions, he was
prescribed or given small, short-term supplies of more powerful
opiate pain relievers, i.e., either Darvocet or Tylenol #3.[109]

     This evidence does not indicate deliberate indifference.   To
the contrary, the record indicates that Isbell repeatedly switched
the pain killer that Gonzales was prescribed in response to his
complaints.   Further, it is undisputed that Gonzales was
consistently receiving some type of pain medication.   Therefore,
even if the pain medication that Gonzales was receiving was not
particularly effective, he has not established a constitutional
violation.   See Mayweather, 958 F.2d at 91 (holding that, although
Mayweather continued to experience chronic back pain, he had not
demonstrated a constitutional violation because "he received
continuous treatment for his back injury"); Varnardo, 920 F.2d at
321 (5th Cir. 1991) ("Unsuccessful medical treatment does not give
rise to a § 1983 cause of action.").   Moreover, to the extent that
Isbell refused Gonzales' requests for stronger, narcotic pain
killers, she simply disagreed with him as to the appropriate
treatment for his pain; she did not violate his Eighth Amendment

---

[107]Id. at MSJ_69.

[108]Id. at MSJ_68.

[109]Id. at MSJ_47, MSJ_44, MSJ_34, MSJ_25.

rights.   See Banuelos, 41 F.3d at 235.   Accordingly, Gonzales'
second claim against Isbell also fails.

Gonzales   third   claim   against   Isbell,   however,   may   be
meritorious.   Gonzales contends that Isbell exhibited deliberate
indifference by refusing to order that he be excused from his
prison work duties, which included manual labor.  Gonzales alleges
that performing this work exacerbated the discomfort caused by his
kidney  stone,  and  that  forcing  him  to  work  resulted  in  the
unnecessary and wanton infliction of excruciating pain.

As the Fifth Circuit explained in Jackson v. Cain, a claim
that a prisoner's work assignments were "inconsistent with or
aggravated his disease is a different claim from his allegation of
inadequate medical treatment . . . ."  Jackson, 864 F.2d at 1244.
Isbell, however, does not specifically address this claim in her
motion for summary judgment.   Instead, she focuses on Gonzales'
inadequate medical care claims.

To  succeed  on  this  claim,  Gonzales  must  show  that  Isbell
refused to exempt Gonzales from his usual work responsibilities
"know[ing] that such an assignment could exacerbate a serious
physical ailment . . . ."  Mendoza, 989 F.2d at 194.  The evidence
in  the  record  could  support  such  a  finding,  particularly  with
regard to Isbell's actions on and after November 20, 2007.

When Isbell first met with Gonzales after he was diagnosed
with a kidney stone on September 17, 2007, she did not order that
he be medically exempted from his work duties.  Because Gonzales

-38-

had not been granted a medical exemption, he reported to his "work assignment in the fields" on September 20, 2007.[110]  According to Gonzales, shortly after beginning work, "the sharp stabbing pain had become so extremely severe I couldn't catch my breath, move or stand right without it intensifying."[111]  Gonzales was taken to the prison medical facility by security personnel.  After being examined by Isbell and/or LVN Galloway, Gonzales' medical records show that Isbell ordered that Gonzales be medically excused from his work responsibilities for five days.[112]  He was instructed to follow up with Isbell on September 24, 2007.[113]

At the September 24, 2007, follow-up appointment, Isbell did not extend Gonzales' work exemption.[114]  Therefore, Gonzales returned to work.  On October 8, 2007, Gonzales reported to his "work assignment in the fields," but "[a]fter starting work [he] was stricken with severely sharp intense pain in [his] side and had to be taken inside from the fields for immediate emergency medical attention."[115]  Gonzales was seen by Galloway and Isbell, and Isbell

---

[110]Memorandum and Support, Docket Entry No. 2, at 2.

[111]Id.

[112]Medical Records at MSJ_44-MSJ_46.

[113]Id.

[114]See id. at MSJ_17; see also Memorandum and Support, Docket Entry No. 2, at 2; Plaintiff's More Definite Statement, Docket Entry No. 8, at 2.

[115]Memorandum and Support, Docket Entry No. 2, at 3.

again ordered that Gonzales be exempted from his work responsibilities, this time for thirty days.[116]

When Gonzales' second work exemption expired he resumed his work responsibilities. On November 20, 2007, soon after Gonzales began work, "the sharp intense pain became severely extreme and prompted field officials to take [him] to the infirmary for emergency medical attention."[117] Gonzales' medical records reflect that he was examined by LVN Cross, who contacted Isbell.[118] Isbell directed that Gonzales again be medically exempted from work duties for another thirty days.[119] Gonzales was also prescribed the pain killers naproxen and Darvocet.[120]

Later that day, Gonzales took his prescription to the "pill window" to pick up his medication.[121] Apparently, Gonzales had modified his medication pass, and Isbell was notified.[122] An entry in Gonzales medical records indicates that Gonzales modified the

----

[116]Medical Records at MSJ_36-MSJ-37.

[117]Memorandum and Support, Docket Entry No. 2, at 4.

[118]Medical Records at MSJ_24-MSJ-26.

[119]Id.

[120]Id.

[121]See Memorandum and Support, Docket Entry No. 2, at 4.

[122]In Gonzales' Memorandum and Support (Docket Entry No. 2), he suggests that he did not modify his medication pass. Whether Gonzales or someone else modified the pass is irrelevant for the success or failure of this claim, however. Therefore, the court assumes arguendo that Gonzales modified the pass.

prescription for Darvocet, changing it from "Darvocet N 100" to "Darvocet N 400."[123]  Gonzales alleges that Isbell, upon learning that he altered the medication pass, became very angry, called him a liar, discontinued the Darvocet, and revoked his thirty day work restriction.[124]  The medical record entry reporting this incident indicates that the Darvocet prescription was, in fact, discontinued.[125]  The entry does not explicitly state that his work restriction was revoked, but later medical records and written requests for medical attention indicate that Gonzales requested a medical work restriction less than thirty days after November 20, 2007, and that Isbell determined that such a restriction was not medically necessary.  Accordingly, the evidence corroborates Gonzales' claim that Isbell revoked the thirty-day work restriction on November 20, 2007.

Gonzales alleges, and the records indicate, that Gonzales was forced to continue working in the fields after November 20, 2007, and that the manual labor continued to exacerbate his pain.  On December 6, 2007, Gonzales was examined by Isbell and allegedly asked her to reconsider her decision to revoke his work exemption,

---

[123]Medical Records at MSJ_14.  The court was unable to determine whether there is any such drug as "Darvocet N 400."  The drug reference book cited by the court in this opinion lists only "Darvocet-N100."  See Mosby's Nursing Drug Reference 1138 (25th ed. 2008).

[124]Memorandum and Support, Docket Entry No. 2, at 4; Plaintiff's More Definite Statement, Docket Entry No. 8, at 3, 16.

[125]See Medical Records at MSJ_14.

explaining to her that "every time I have to go to work in the fields, I always end up having to be brought in for emergency medical attention for this pain."[126]  The medical record entry from the December 6, 2007, appointment indicates that Isbell denied this request, noting "[n]o medical indication for restrictions at this time."[127]  On December 7, 2007, Gonzales submitted a written request for medical attention repeating his request for a work restriction because his work duties triggered severe pain.[128]  His requests went unheeded, and no further work exemptions were granted.

As of November 20, 2007, Gonzales had been brought to the prison medical facility at least three times by security personnel after manual labor in the fields triggered severe pain.  This suggests that Gonzales' work duties tended to exacerbate his symptoms and that Isbell was aware of that fact.  Further, the evidence does not indicate that Gonzales' symptoms or medical condition changed between the time that Isbell issued the work exemption on November 20, 2007, and the time that she revoked it later the same day.  In other words, nothing suggests that Isbell had any medical reason for revoking Gonzales' work restriction on November 20, 2007.  Therefore, based on this evidence, a reasonable

---

[126]Memorandum and Support, Docket Entry No. 2, at 5.

[127]Medical Records at MSJ_69.

[128]Plaintiff's Counter-Claim to Defendant's Motion for Summary Judgment, Docket Entry No. 35, at Exhibit D, at NSC-24.

-42-

fact finder could conclude that Isbell revoked it in retaliation for Gonzales' attempt to modify his prescription.

If that was the case, a jury could conclude that Isbell acted with deliberate indifference to Gonzales' pain. See Jackson, 864 F.2d at 1246 ("If prison officials knowingly put [the plaintiff] on a work detail which they knew would significantly aggravate his serious physical ailment such a decision would constitute deliberate indifference to serious medical needs."). The fact that Gonzales did not suffer any permanent or residual injury does not defeat his claim. Id. at 1247 ("We have never imposed a permanent injury requirement on claims under the Eighth Amendment."). Pain alone can be actionable. See Gregg v. Georgia, 96 S. Ct. 2909, 2925 (1976) (holding that the Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" (emphasis added)). Accordingly, Gonzales has stated a valid claim for a violation of a clearly established constitutional right, and there is sufficient supportive evidence in the record to create a genuine issue of material fact as to the elements of that claim.

Isbell is nevertheless entitled to qualified immunity "if . . . her conduct [was] objectively reasonable in light of clearly established law." Easter, 467 F.3d at 465. At the time of the events giving rise to Gonzales' claim, it was clearly established in this circuit that forcing a prisoner to work "know[ing] that such an assignment could exacerbate a serious physical ailment . . . could constitute deliberate indifference." Mendoza, 989 F.2d

-43-

at 194.  There is evidence in the record suggesting that Isbell may have revoked Gonzales' medical work exemption and subsequently refused to issue another one in retaliation for his attempt to modify his medication pass -- not for any valid medical reason -- with knowledge that manual labor tended to significantly exacerbate his already severe pain.  Isbell has submitted no evidence that a work exemption could be revoked for altering a medication pass.  If she indeed acted with such knowledge and motivation, then her behavior would not have been objectively reasonable in light of clearly established law.  Accordingly, Isbell is not entitled to summary judgment on this claim.

### III.  <u>Gonzales' Motions</u>

**A.  Plaintiff's Objection to Defendant Isbell, George, and Cross' Original Answer (Docket Entry No. 20)**

In Plaintiff's Objection to Defendant Isbell, George, and Cross' Original Answer (Docket Entry No. 20), Gonzales moves the court to strike these defendants' original answer.  Gonzales asserts that "the Defendants answer fails to fairly meet the substance of the averments in the complaint," and that the defendants denials "fail to deny each claim asserted against the Defendants" as required by Federal Rule of Civil Procedure 8(b).[129] Gonzales also asserts that the defendants' answer fails to set

---

[129]Plaintiff's Objection to Defendants Isbell, George, and Cross' Original Answer, Docket Entry No. 20, at 1.

forth affirmative defenses as required by Federal Rule of Civil Procedure 8(c).

In their answer, defendants Isbell, George, and Cross generally "deny each and every allegation in Plaintiff's complaint except those expressly admitted herein."[130]  The defendants then proceed to admit two of Gonzales' allegations.[131]  This complies with Rule 8(b), which allows a party to "generally deny all [allegations] except those specifically admitted." Fed. R. Civ. P. 8(b)(3).  Further, in their answer, the defendants specifically assert the affirmative defenses of qualified, official, sovereign, and Eleventh Amendment immunity, and that Gonzales failed to exhaust administrative remedies pursuant to 42 U.S.C. § 1997(e). This satisfies Rule 8(c).  Accordingly, the court will deny this motion.

**B.   Motion for Entry of Default (Docket Entry No. 28)**

Gonzales moves the court pursuant to Federal Rule of Civil Procedure 55(a) to enter a default judgment against defendants Holmes, Davis, Galloway, and Campbell for failing to file an answer.  Defendant Galloway, however, filed an answer on March 17,

---

[130]Defendants' Original Answer, Docket Entry No. 15.

[131]See id. at ¶¶ 1-2.

-45-

2009,[132] and defendants Holmes, Davis, and Campbell filed an answer on April 2, 2009.[133]  Therefore, this motion will be denied.

**C.    Motion for Order to Compel Disclosure/Discovery (Docket Entry No. 29) and Motion for Leave for Continuance to Conduct Additional Discovery or Extension of Time (Docket Entry No. 30)**

In his Motion for Order to Compel Disclosure/Discovery (Docket Entry No. 29), Gonzales moves the court pursuant to Federal Rule of Civil Procedure 37(a)(3)(B) to compel the defendants to produce certain documents that he has requested and answers to interrogatories that he has served.  In his Motion for Leave for Continuance to Conduct Additional Discovery or Extension of Time (Docket Entry No. 30), Gonzales asks the court to grant him an extension of time to file a response to the defendants' motion for summary judgment and re-urges the court to compel the defendants to produce the same documents and answers to interrogatories described in his motion to compel.

Gonzales filed a response to defendants' motions for summary judgment on April 27, 2009.[134]  Therefore, Gonzales' motion for an extension of time to file a response to defendants' motions for summary judgment is moot.

---

[132]Defendant's Original Answer, Docket Entry No. 23.

[133]Defendants Davis, Holmes, and Campbell's Original Answer, Docket Entry No. 32.

[134]<u>See</u> Plaintiff's Counter-claim to Defendants' Motion for Summary Judgment, Docket Entry No. 35.

As to Gonzales' motions to compel discovery, the court, on October 31, 2008, ordered the defendants to disclose to Gonzales "all information relevant to the claims or defenses of any party."[135]  The court is confident that defendants will comply with the court's order of October 31, 2008, and will expeditiously provide Gonzales with any relevant documents and information regarding the one remaining claim if they have not already done so. Further, the interrogatories that Gonzales served, which he included as an attachment to his Motion for Leave for Continuance to Conduct Additional Discovery or Extension of Time (Docket Entry No. 30), are not relevant to the single remaining claim against defendant Isbell.  Therefore, the court will deny Gonzales' motions to compel discovery.

## IV.  **Order**

Based on the foregoing analysis, Defendants Davis, Holmes, and Campbell's Motion for Summary Judgment (Docket Entry No. 33) is **GRANTED.**  Defendants Isbell, Cross, George, and Galloway's Motion for Summary Judgment (Docket Entry No. 25) is **GRANTED** as to all claims except for Gonzales' claim against Isbell in her individual capacity for failing to order a medical work exemption.  As to that single claim, the motion for summary judgment is **DENIED.**

---

[135]Order to Answer, Docket Entry No. 11, at 2.

Gonzales' Objection to Defendant Isbell, George, and Cross' Original Answer (Docket Entry No. 20), Motion for Entry of Default (Docket Entry No. 28), Motion for Order to Compel Disclosure/Discovery (Docket Entry No. 29), and Motion for Leave for Continuance to Conduct Additional Discovery or Extension of Time (Docket Entry No. 30) are **DENIED**.

Additionally, the court **ORDERS** the following:

1. Docket Call is set for August 14, 2009, at 4:00 pm by telephone.

2. Gonzales shall provide a copy of this order to the appropriate TDCJ-CID officials so that he may appear for Docket Call by telephone.

3. Gonzales shall provide a telephone number to the court as soon as possible where he can be reached on August 14, 2009, at 4:00 pm for Docket Call. Counsel for Isbell shall also provide the court with a direct telephone number where counsel may be reached for Docket Call.

4. Defendant Isbell shall prepare a draft Joint Pretrial Order and provide Gonzales with a copy by July 21, 2009. Gonzales shall notify Isbell's counsel of any input or objections to the draft Joint Pretrial Order by August 3, 2009. Isbell shall file the completed Joint Pretrial Order with the court by August 11, 2009.

Given the age of this case and the limited issue to be tried, it is very unlikely that the court will grant extensions for these deadlines.

**SIGNED** at Houston, Texas, on this 2nd day of July, 2009.

SIM LAKE
UNITED STATES DISTRICT JUDGE

-48-